IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL MANSFIELD | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ERIC HOLDER, | : | NO. 09-cv-5718 |
| Defendant. | : | |

OPINION

Legrome D. Davis, J.                                        February 8, 2012

I.    Introduction

This matter concerns Paul Mansfield ("Plaintiff" or "Mansfield"), a former Assistant

United States Attorney ("AUSA") in the U.S. Attorney's Office ("USAO") for the Eastern

District of Pennsylvania, and the circumstances surrounding his removal from that position.

Mansfield began working as an AUSA in 1991.  Unfortunately, Mansfield had health problems,

most notably a heart condition, which resulted in hospitalizations and extended medical leaves of

absence during 2001 and 2003.  Despite his medical issues, Mansfield made it abundantly clear

to his supervisors that he did not want or need an accommodation to do his job.

From his hiring in 1991 until April of 2006, Mansfield was a member of the Organized

Crime Division, a/k/a the Organized Crime "Strike Force," of the USAO.  In late-April of 2006,

management informed Mansfield that he was being transferred out of the Strike Force.  This

"involuntary transfer" greatly upset Mansfield, and several days later, Mansfield filed the first of

what would become many EEO complaints.

1

Over the next year-and-a-half, Mansfield failed in a number of ways to adequately perform his duties as an Assistant United States Attorney.  As a result of these failures, Mansfield was progressively disciplined with a Letter of Reprimand on December 12, 2006; a 2-day suspension on February 15, 2007; and a 10-day suspension on March 28, 2007.  On September 21, 2007, then-U.S. Attorney Patrick Meehan proposed Mansfield's removal. Ultimately, Andrew Niedrick from the Executive Office for United States Attorneys ("EOUSA") upheld Mansfield's termination on October 25, 2007.

Mansfield brought this civil action on December 2, 2009, "for the purpose of seeking appropriate remedies for employment based discrimination based upon age and disability, and based upon retaliation for having filed discrimination and retaliation complaints."  (Doc. No. 1 ¶ 1).  Mansfield's initial Complaint contained the following four (4) counts: Count I (Rehabilitation Act / Disability Discrimination, 29 U.S.C. § 791); Count II (Rehabilitation Act / Retaliation); Count III (Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA")); and Count IV (ADEA / Retaliation).  However, by stipulation of the parties, Counts I, III, and IV of the Complaint were voluntarily dismissed.  (Doc. No. 22).  As such, only Count II, the Rehabilitation Act retaliation claim, remains for our consideration.

To resolve this dispute, we conducted a bench trial that concluded on January 12, 2012. Having thoroughly considered the documentary evidence and testimony, we make the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  In brief, Mansfield asks us to find that USAO managers and supervisors disciplined and ultimately terminated him in retaliation for his protected activity, e.g., his filing of EEO complaints.  The evidence does not support this conclusion.  Instead, we find that Mansfield lost his job because

he repeatedly failed to perform his duties; was not open-and-honest with his superiors about his

failures; did not appreciate or recognize the seriousness of the problem; and showed no signs of

improvement, making rehabilitation extremely unlikely.

II.   Findings of Fact[1]

1.   We begin broadly by noting that we find no direct documentary evidence of retaliation
     against Mr. Mansfield.  Therefore, this case turns largely on credibility: whom do we
     believe?  What inferences should we draw from the objectively apparent facts?  With that
     in mind, we find Plaintiff Paul Mansfield's credibility to be lacking, primarily because of
     the many inconsistencies in his testimony and his demeanor on the stand.

2.   For example, Mansfield testified that after he was fired, he felt numb for the first week or
     two, but "every day, every day since then I've done something to find a job."  Tr. 4, 65.
     However, contrary to this testimony, Mansfield admitted to his doctors that he was not
     going all out looking for a job and could be trying harder.  Tr. 4, 65-70.

3.   Second, Mansfield told an EEO investigator that he was transferred from the Strike Force
     because he had opposed the merger of the Strike Force into the criminal division.  Tr. 4,
     74.  In this suit, Mansfield claims that the transfer was retaliation for protected activity of
     some sort.

4.   Third, Mansfield testified that he thought his 2005 performance evaluation (JE26) was a
     "good evaluation," except for the final paragraph of the narrative which was ultimately
     changed.  In reality, according to a contemporaneous letter Mansfield sent to Frank Labor,
     his friend and supervisor, Mansfield was extremely concerned about the fairness of the
     entire evaluation.  Tr. 4, 77-80.

5.   Fourth, Mansfield testified that he always wanted to stay a prosecutor, but he was looking
     for non-prosecutor jobs even prior to his transfer out of the Strike Force.  Tr. 4, 61-63.

6.   Fifth, Mansfield initially asserted that Title IIIs (wiretaps) are time- and deadline-
     intensive, but later claimed that Title IIIs are not necessarily time-sensitive.  Tr. 2, 225; 4,

---

[1]We use the following numbering system in citing to the trial transcript: 1 = May 16,
2011; 2 = May 17, 2011; 3 = May 18, 2011; 4 = January 11, 2012 (morning); 5 = January 11,
2012 (afternoon); 6 = January 11, 2012 (evening); 7 = January 12, 2012 (morning); 8 = January
12, 2012 (afternoon); 9 = January 12, 2012 (evening).  For example, Tr. 1, 2:3-4 refers to page 2,
lines 3-4, of the May 16, 2011, transcript.  Additionally, "JE" refers to "Joint Exhibit," "D" refers
to "Defense Exhibit," "P" refers to "Plaintiff Exhibit," and "C" refers to Robert Courtney's trial
deposition.

88; 4, 145. Title III applications are always time-sensitive.

7.  Sixth, with respect to his failures on the Underwood brief that led to his 2-day suspension, Mansfield claimed he could not do the brief because he got sick with a stomach virus on December 14th.  Then, when questioned about whether he previously said that he was sick for two (2) days, Mansfield qualified his answer by saying he was sick in the "early morning hours" of December 13th and 14th.  Tr. 4, 96-97.  However, Mansfield apparently saw his doctor on December 13th but never told the doctor about the stomach virus.  When asked why, Mansfield testified that "it [the stomach virus] occurred sometime shortly thereafter."  Tr. 4, 102-03.  We simply cannot reconcile these timelines unless we believe that Mansfield somehow saw his doctor before the "early morning hours" of December 13th.  We find this very unlikely.

8.  Seventh, regarding an early morning e-mail Mansfield supposedly sent to Robert Zauzmer ("Zauzmer"), the Chief of Appeals in the USAO, concerning the Underwood brief, Mansfield testified that he learned that Zauzmer did not receive the e-mail from Zauzmer himself.  In fact, Mansfield knew the e-mail did not go through before he even left for work.  Tr. 4, 97-99; D103.

9.  Eighth, Mansfield testified that during the course of a harsh verbal exchange with Zauzmer on December 14th regarding the Underwood brief, Zauzmer told him that "everybody hates you."  Tr. 2, 251-54.  According to Zauzmer, this is a complete fabrication.  Tr. 8, 70-71.  Later that same day, Mansfield wrote an e-mail to Zauzmer thanking him for his kind words and genuine expression of happiness for him (Mansfield), because Mansfield "know[s] it comes from the heart."  Tr. 4, 103-04; D106.  Mansfield makes no mention of the alleged "everybody hates you" comment.  In addition, none of Mansfield's many EEO complaints discuss Zauzmer's supposed comment.  Contrary to Mansfield's testimony, Zauzmer did not say "everybody hates you" to Mansfield.

10.  Finally, Mansfield initially admitted that he was not as productive as he normally would have been while he was acting in the Dreamgirls stage production.  Tr. 4, 49.  On the other hand, Mansfield later testified that acting actually helps him do his work as an attorney and "certainly didn't detract or deter from my work at all. . ."  Tr. 4, 164-65.

11.  Given all these inconsistencies, we must view Mansfield's testimony with a skeptical eye.  Additionally, as he testified, Mansfield appeared to be frustrated, even angry.  After observing Mansfield's demeanor and the tone of his testimony, we have no doubt that Mansfield still harbors serious resentment towards those in the USAO who he perceives to have wronged him.  This gives us further reason to pause before blindly accepting Mansfield's version of events.

12.  In contrast, we found the defense witnesses, including now-Congressman Patrick

4

Meehan,[2] now-U.S. Marshal David Webb,[3] former Chief of the Criminal Division Linda Dale Hoffaand Chief of Appeals Robert Zauzmer, to be credible. They testified consistently regarding Mansfield's performance deficiencies and the reasons for their actions. We saw no anger or resentment towards Mansfield, but rather genuine concern and sadness about the situation. As detailed immediately below, numerous USAO managers and supervisors testified that they were not trying to drive Mansfield out of the office, but rather attempting to help him do his job and become more productive. In large part, we believe them.

13.    For example, Linda Hoffa, then-Chief of the Criminal Division, testified that she hoped moving Mansfield out of the Strike Force would invigorate and energize him by surrounding him with new people and giving him a new supervisor. Tr. 1, 44:4-12. Hoffa also testified that the progressive discipline was designed to get through to Mansfield. She hoped he would turn it around and felt sad when he did not because she wanted him to succeed. Tr. 1, 83; 1, 86-87.

14.    Similarly, Laurie Magid, then-First Assistant to U.S. Attorney Patrick Meehan, testified that they took disciplinary actions "hoping that the notice provided by the discipline and the serving of the discipline would cause him [Mansfield] to change the way he was conducting himself and that he would be able to perform the way we expected him to." Tr. 2, 59:9-15. Additionally, on March 4, 2007, Zauzmer at least broached the subject of terminating Mansfield after his failures in the Thomas and Gay cases. See D123. However, Magid and the rest of upper management gave Mansfield a 10-day suspension and another chance instead. Tr. 2, 75:1-14. This is not the action of an employer trying to hurry someone out the door. Tr. 8, 73-74.

15.    Likewise, U.S. Attorney Meehan testified that prior to the disciplinary action, management was trying to find a way for Mansfield to carry his share of the load. Tr. 5, 22. In that vein, the office assigned Mansfield to work on immigration briefs ("OIL briefs") to "give him work that he would do so that we would be able to handle the requirements of the office." In a February 16, 2007, meeting, Meehan asked Mansfield for suggestions as to how the office could help him be more productive. Tr. 6, 20. According to Meehan, the disciplinary proceedings were not punitive. Rather, management hoped discipline would help Mansfield understand the seriousness of the situation. In other words, the office made "legitimate efforts to try to work along with an employee that we cared about." Tr. 6, 22. "[I]t was an effort on the part of everybody, [a] legitimate, heartfelt effort to try." Tr. 6, 82.

---

[2]Congressman Meehan was the U.S. Attorney for the Eastern District of Pennsylvania during the relevant time frame.

[3]Marshal Webb was one of Mansfield's supervisors in the USAO's Criminal Division during the relevant time frame.

16.     David Webb's testimony dovetails with that of the others -- management tried to work
        with Mansfield, not vindictively railroad him out of the office.  In particular, management
        told Webb that they were transferring Mansfield to Webb's team so Webb could "work
        with him and get his stats up a little bit and hopefully he'll be a productive member of the
        office."  Tr. 7, 126.  Webb tried to do just that by giving Mansfield short cases so he
        could get his "feet on the ground here in the criminal division and get rolling and be
        productive."  Tr. 7, 102.

17.     Finally, in the context of the OIL brief assignment, Robert Zauzmer testified that "[t]he
        whole point here was to see if we could help him, see if we could identify why, suddenly,
        there was this productivity problem and figure out a way to get around it."  Tr. 8, 42.
        Even though there were some problems with Mansfield's work in late 2005 and early
        2006, he was not disciplined until December of 2006.  As Zauzmer noted, discipline is
        "an extraordinary thing."  Tr. 8, 43-44.  This all indicates to us that Mansfield's
        supervisors did not act rashly, or prematurely, or in a retaliatory manner, in imposing
        discipline.  Rather, numerous managers sincerely tried to work with Mansfield and hoped
        he would succeed.

18.     Now that we have discussed the critical credibility issue, we turn to the specific facts and
        circumstances of this case.  We present the facts in chronological order and in some detail
        because context plays such an important role in a retaliation case such as this.  In other
        words, no employment decision occurs in a vacuum.  The circumstances surrounding the
        decision give us insight into the employer's state of mind.  Here, we must determine why
        the USAO disciplined Paul Mansfield and ultimately terminated his employment.  Was it
        for the legitimate reasons stated, or was it in retaliation for Mansfield's EEO complaints
        (or other protected activity)?  The following facts help illuminate that important question.

19.     As noted *supra*, Paul Mansfield had medical issues, including a heart problem, that led to
        his hospitalization in 2001 and 2003.  On June 14, 2001, after Mansfield's first
        hospitalization, Mansfield's doctor Fania Samuels sent a letter to Robert Courtney,
        Mansfield's Strike Force supervisor, advising Courtney that Mansfield should do no
        heavy lifting, reduce his stress level as much as possible, and limit his work to forty (40)
        hours per week barring "exceptional circumstances" such as preparing for trial.  Tr. 4, 14-
        15.

20.     However, several months later on September 5, 2001, Dr. Samuels sent a follow-up letter
        to Courtney stating that Mansfield "continued to make excellent progress," so she did not
        believe that Mansfield needed any special accommodations.  Dr. Samuels further opined
        that Mansfield could perform the essential functions of an AUSA, e.g., trials, hearings,
        motions, grand jury proceedings, and appellate work.  Tr. 4, 17-18.  In fact, *no one* ever
        communicated to anyone at the U.S. Attorney's Office that Mansfield needed an
        accommodation to do his job.  Tr. 4, 18.  In the same vein, no doctor or medical provider

ever opined to the USAO that Mansfield was "disabled." Tr. 4, 13:19-14:7.

21.   The evidence tells us that in the early 2000s, Mansfield was a solid but unspectacular AUSA. From 2001 through 2005, Mansfield's annual performance evaluations indicate that he "met-to-exceeded expectations" four (4) times[4] and "substantially exceeded expectations" once, in 2002. See JE22, JE23, JE24, JE25, JE26. However, Mansfield's legal writing required some supervisory review. See JE23, JE24, JE25. As Laurie Magid correctly recognized, these are "not glowing evaluations." Tr. 2, 50:17-51:1. According to U.S. Attorney Meehan, "pretty much the entire office gets a satisfactory" rating. Tr. 6, 63. Additionally, Zauzmer characterized Mansfield as a soldier, not a general, but acknowledged that Mansfield worked very capably over the years. In fact, prior to 2003 or 2004, Zauzmer thought quite highly of Mansfield's appellate work. Tr. 8, 10-11; 8, 28.

22.   By mid-2003, U.S. Attorney Meehan had learned of Mansfield's heart problems. Tr. 5, 4. On September 30, 2003, following Mansfield's second extended hospitalization, Mansfield's doctor Frank Marchlinski sent a letter to Courtney declaring that Mansfield could return to work full time without any physical restrictions on October 1, 2003. Tr. 4, 18-19.

23.   In January of 2004, then-First Assistant U.S. Attorney Geoff Moulton had a discussion with Mansfield about his work as an AUSA, speaking generally about options such as disability retirement, workers' compensation, and a potential transfer from the Strike Force to the Criminal Division. Tr. 1, 157-59. At this time, almost three (3) years before the first formal disciplinary action against Mansfield, Moulton was aware that Mansfield was not among the most productive attorneys in the Strike Force and was reluctant to take the lead on investigations. Tr. 1, 159.

24.   Moulton memorialized his conversation with Mansfield in a letter to file dated January 16, 2004. See D2. Apparently, Mansfield initially asked Moulton whether the office would accommodate his heart condition by (1) permitting his friend Frank Labor to supervise him and assign him work, and (2) confining his role to assisting on cases rather than taking the lead. Moulton explained that the next step in the accommodation dialog would entail Mansfield supplying medical documentation. In response, Mansfield affirmatively stated that he was not requesting any job accommodation. See D2. In other words, *Mansfield, not management, ended the accommodation dialog*. This became a common theme over the course of the next several years.

25.   By his own account, Mansfield has "had a hobby of acting since [he] was a little boy. And it has been a lifelong avocation." Tr. 4, 41:4-7. On February 9, 2004, Mansfield sent a letter to Tina Fey at Saturday Night Live in New York City in hopes of appearing on the show (for a second time). Tr. 4, 50-51; D182. Mansfield told Fey that he still

---

[4]The name of this rating category was changed to "successful" from 2005 onward.

worked as a government attorney but devoted virtually all his free time (nights, weekends, and vacation time) to acting and performing.  Tr. 4, 50-51.

26.     Management had concerns about Mansfield's performance at work well before Mansfield's transfer out of the Strike Force and subsequent EEO complaints.  For example, on April 22, 2004, two (2) years prior to Mansfield's transfer and initial EEO complaint, Zauzmer e-mailed Magid, Courtney, and others, to express concern about Mansfield's handling of the Scott-Minnis-Davis appeal.  See D5.  In this appeal, the Third Circuit granted Mansfield two thirty-day extensions to submit his brief and then ordered that no further extensions would be granted.  Even though Mansfield had eighty-one (81) days to complete the brief, the draft Mansfield submitted to Zauzmer was a woefully inadequate "cut-and-paste" job.  This forced Zauzmer, for the first time in his career, to ask the Third Circuit for another extension after the court had said no more would be granted.  Despite this additional extension of time, Mansfield's next brief still had large gaps, and Zauzmer had to write much of it himself.  Tr. 8, 11-15.

27.     Surprised and concerned, Zauzmer talked to Mansfield about the situation.  Zauzmer asked if medical problems led to Mansfield's poor handling of the appeal brief.  In response, Mansfield stated that health problems were not to blame; he just had a difficult time with the brief.  Tr. 8, 15.

28.     However, during the 2004-2005 time frame, Mansfield did tell management about his health problems, including that his medication caused him to "zone out" and have difficulty reading cases and doing legal research.  Tr. 2, 201-02.

29.     Also during this time period, the USAO faced significant fiscal challenges.  According to U.S. Attorney Meehan, because of cutbacks in funding, the office could not replace the attorneys who left.  This meant more work for those who remained.  Tr. 5, 12.  When one colleague does not do his share, the work falls on the shoulders of others.  Tr. 5, 18.

30.     By mid-2005, Mansfield's health had gotten much better.  As stated by Mansfield's doctors in a May 10, 2005, letter, Mansfield was doing very well.  The doctors were successfully treating Mansfield's sleep apnea, and his energy level and ability to concentrate had greatly improved.  See Tr. 4, 30-31; D209, at 15.

31.     In October of 2005, the Strike Force merged into the Criminal Division.  According to Frank Labor, Mansfield openly objected to the merger during merger meetings conducted by Hoffa and Magid.  Tr. 1, 212-13.  Hoffa admitted that she knew there was some dissatisfaction with the Strike Force merger into the Criminal Division.  Tr. 1, 20:11-17.

32.     In December of 2005, management selected Mansfield and one other individual in the Criminal Division for a six-month immigration brief ("OIL brief") writing assignment.  Tr. 2, 209.  According to Hoffa, she looked at the entire Criminal Division when deciding

to whom to give the OIL brief assignment.  Tr. 1, 27:18-28:2.  She selected Mansfield because he was a good writer; he had "one of the lightest dockets"; he did not have difficult or pressing cases; he was not being as productive as he should have been; and she would not have to take much work away from him because of his light docket.  Tr. 1, 31-32.  Magid's independent testimony corroborates Hoffa's -- Mansfield was assigned OIL briefs because he had a very light docket, so the assignment would cause less disruption to Mansfield than it would to other AUSAs.  Tr. 2, 63:15-64:7.

33.  On December 21, 2005, Zauzmer e-mailed Magid and Hoffa expressing concern about yet another Mansfield brief, i.e., the Hoxha brief.  In Zauzmer's opinion, even though the Third Circuit had granted two months of extensions, Mansfield had never really read the cases cited by the appellant.  Zauzmer had to rewrite much of the brief.  See D15.  Zauzmer saw Hoxha as a replay of the situation in Scott-Minnis-Davis.  Mansfield turned-in an unfinished brief right before the final deadline, once again forcing Zauzmer to ask the Third Circuit for more time after the court had ordered that no more extensions would be permitted.  Tr. 8, 18-19.  And again, Mansfield submitted an inadequate "cut-and-paste" job even after the last extension, which necessitated Zauzmer rewriting the brief overnight.  Tr. 8, 21-22.  Zauzmer felt as though Mansfield had spent almost no time on the brief over the last three months.  Tr. 8, 22.

34.  During this period of declining performance, and unbeknownst to his supervisors, Mansfield had been acting in a stage production of Dreamgirls.  Tr. 4, 41-49.  Although the show included weekday matinees and a weekly honorarium, Mansfield did not ask for permission to perform.  Mansfield did, however, take annual leave to do the matinees.  See Tr. 1, 132; 3, 36-37; 8, 25-26; C, 41; D15.  The fact that Mansfield did not clear this activity beforehand concerned his Strike Force supervisor Robert Courtney.  Tr. 3, 36-37; C, 41-42.

35.  At some point during the OIL brief assignment, Mansfield told Zauzmer that brief writing was difficult for him.  Tr. 8, 27; D22.  However, Mansfield never said that he could not do the briefs.  Tr. 8, 28; D22.

36.  Mansfield had problems throughout the OIL brief assignment, primarily with timeliness.  According to Zauzmer, Mansfield's work was never, ever timely, and deadlines constantly had to be changed.  Tr. 8, 32.  This was the same problem Zauzmer saw with the Hoxha brief, now repeated month after month.  Tr. 8, 33; Tr. 8, 36-40; See D16, D17, D18, D19, D20, D21, D22.  Again, we stress that all of these problems surfaced before Mansfield's transfer out of Strike Force and before he filed his first EEO complaint.

37.  According to a January 20, 2006, letter between Mansfield's doctors, Mansfield complained of difficulty concentrating and reading long cases without distraction.  According to the doctor, this may have been related to Mansfield's medication, but many things, including lack of exercise, could have contributed to Mansfield's purported

9

concentration problem.  Tr. 4, 31-32; D209, at 23.

38.  On January 24, 2006, Mansfield got into a car accident and suffered a back injury.  Tr. 2, 212-13.

39.  Even prior to his transfer out of Strike Force, Mansfield was aware of his performance deficiencies.  For example, in Mansfield's first EEO complaint, Mansfield stated that "[o]n April 19, 2006. . .REC [Courtney]. . .criticized [Mansfield] for not getting briefs to supervisors in a more timely manner."  JE1, at 4.  Additionally, in February of 2006, Mansfield received his performance evaluation for 2005.  See JE26.  The associated commentary notes that "In December [of 2005], Paul encountered a problem in timely finishing an appeal brief assignment.  This has been discussed with Paul, including steps to manage his time more efficiently and complete assignments in a timely manner." JE26.  Mansfield's performance was lacking despite the fact that he had one of the lightest caseloads of any AUSA at the time.  Tr. 1, 59:7-60:6.

40.  On April 24, 2006, Hoffa informed Mansfield that he was being transferred out of Strike Force and into the Firearms division.  Tr. 1, 36:5-10.  Hoffa admits that Courtney told her that Mansfield would not be happy with the transfer.  Tr. 1, 39:4-18.  This proved to be the case; the transfer greatly upset Mansfield, and he let Hoffa know about it.  Tr. 1, 64:10-16; 2, 234-37; 7, 96.  However, Mansfield could not explain to Hoffa how he could do the work in Strike Force but not in another division of the office.  Tr. 1, 65-66.

41.  Regarding the rationale for transferring Mansfield, Hoffa explained that she moved many people among the various teams in the Criminal Division depending on the needs of the office.  Tr. 1, 36:11-20.  The evidence supports this assertion, as there were three (3) transfers or reassignments in 2003; thirteen (13) in 2004; twenty-two (22) in 2005; and nine (9) in 2006.  Tr. 1, 129.  Hoffa testified that she transferred Mansfield in particular because he was not productive in his current position and did not get along with his supervisor Robert Courtney.[5]  Hoffa believed a docket of smaller, more reactive cases would be good for Mansfield.  Additionally, the office had lots of work in the Violent Crimes and Firearms areas.  Tr. 1, 39:11-40:9; 1, 43:18-44:12.  This explanation makes sense and seems quite reasonable.

42.  Although Hoffa initially intended to transfer Mansfield to Firearms, Magid changed the transfer to Violent Crimes one day later, on April 25, 2006.  Tr. 2, 241-43.  According to Magid, she transferred Mansfield to the Violent Crime division for the benefit of the office.  The group had lost attorneys, and the Organized Crime / Strike Force division did not have as much work as Violent Crimes did.  Tr. 2, 18.  Magid noted that Mansfield was not alone; Magid transferred other people on the same day, including another

---

[5]Mansfield's friend and co-worker Suzanne Ercole confirmed this friction between Mansfield and Courtney, Tr. 1, 179:2-16, as does Mansfield's initial EEO complaint.  See JE1.

10

individual to Violent Crimes.  Tr. 2, 19.  Magid also noted that Mansfield had the lightest docket and was the least productive attorney in Strike Force.  Tr. 2, 21.  Courtney confirmed that Mansfield was "always at the bottom" of strike force attorneys in terms of productivity and one of the two lowest producers in the division.  Tr. C, 20-21.  Finally, Magid also took into consideration that David Webb, the Violent Crime division supervisor, "is perhaps the most experienced supervisor that we had in the office," and that Mansfield might take more kindly to a transfer to Violent Crimes because it "had a little extra prestige to it in general."  Tr. 2, 65-66.  As with Hoffa's explanation, we find Magid's decision to transfer Mansfield well-supported and reasonable.

43.    On April 27, 2006, just days after management informed Mansfield of the transfer, Mansfield filed the first of what would turn into many EEO complaints.  See JE1.  The complaint alleged physical disability, age discrimination, mental disability, and reprisal.  JE1, at 2.  Nonetheless, in the complaint, Mansfield declared that "he does not seek any accommodation, much less reasonable accommodation, from the office."[6]  JE1, at 5.

44.    On May 5, 2006, Magid e-mailed individuals in the personnel department mentioning that Mansfield had filed an EEO pre-complaint.  The next day, Magid followed-up with Mansfield's supervisors by requesting Mansfield's case management reports (CMRs) for the previous two years.  See P38.  Magid explained that she requested this information to further verify the reasons Mansfield was moved from the Strike Force, e.g., his light docket, and she expected the EEO counselor to ask for such information.  Tr. 2, 94:16-96:9.

45.    On May 8, 2006, Paul Mansfield's transfer from Strike Force to Violent Crimes officially took effect.  Tr. 2, 231.

46.    Mansfield's performance continued to wane.  On June 2, 2006, Zauzmer e-mailed Magid about Mansfield's failures on the Li immigration brief.  See D54.  Zauzmer had spoken to Mansfield about the poor quality and continued untimeliness of his work.  Similar to the briefs discussed *supra*, Zauzmer found the Li brief to be a poor cut-and-paste job with discussion of irrelevant issues.  Tr. 8, 46-48.  Webb testified that Mansfield struggled to get anything done, and he simply did not move his cases.  Tr. 7, 104.  According to Mansfield's case management report ("CMR") dated July 17, 2007, Mansfield had indicted only three (3) cases in fiscal year 2006 and three (3) cases to date in fiscal year 2007.  Tr. 7, 115-17; D170A.  Webb had constant conversations with Mansfield about his failure to move cases and meet deadlines.  Tr. 7, 109.  Mansfield procrastinated about everything and drove supervisors crazy by submitting everything at the last minute.  Tr. 7, 105; 7, 111-12.

---

[6]We refer to the April 27, 2006, document as Mansfield's first EEO complaint, even though Mansfield titled the document a "pre-complaint."

47.   On June 9, 2006, Mansfield filed an EEO complaint seeking reinstatement to strike force, among other things.  See JE3.

48.   On June 15, 2006, the EEO staff of the EOUSA informed U.S. Attorney Meehan via letter of Mansfield's complaint.  See JE4.  The EOUSA followed-up with Meehan regarding this complaint on July 5, 2006.  See JE5.

49.   On July 24, 2006, Zauzmer wrote an e-mail to other managers trying to make some sense of what was happening with Mansfield.  According to Zauzmer, Mansfield was trying to escape normal work responsibilities, which confirmed to Zauzmer that Mansfield was suffering from a "major block, whether physical or psychological, in undertaking work." P34.  By this time, Zauzmer had come to realize that Mansfield had serious issues, but he was never able to pinpoint the reason.  Tr. 9, 39.

50.   In October of 2006, Mansfield had an ablation procedure on his heart.  Tr. 4, 32. Following the procedure, Mansfield's doctor cleared him to return to work immediately and without restriction.  See D3.  Mansfield gave this note to Webb, his supervisor at the time.  Tr. 4, 24-25.  Zauzmer saw the note as well.  Tr. 8, 60.

51.   In late 2006, Mansfield was assigned to write a brief in the Underwood matter.  Tr. 8, 60-61.  The government filed for and received a final thirty (30) day extension of time, which set the brief due date as December 15, 2006.  Tr. 8, 60-61.  Mansfield's failures on the Underwood brief ultimately led to his 2-day suspension early in 2007.

52.   Mansfield was also failing on other matters.  On December 1, 2006, Jim Kasson, Special Agent in Charge ("SAC") at the DEA, personally called Linda Hoffa to complain about Mansfield's handling of a Title III.  According to Kasson, Mansfield had cancelled ten (10) meetings with his agents.  Essentially, Mansfield had let the affidavit sit idle for almost thirty (30) days.  See D95; Tr. 1, 119-21.  This is terribly problematic because Title IIIs / wiretaps are time sensitive.  Tr. 1, 184:2-14.  Further, the fact that the SAC complained directly to the Criminal Division chief is very unusual and underscores the seriousness of the problem.  Tr. 2, 29.

53.   On December 12, 2006, U.S. Attorney Meehan issued Mansfield an official reprimand for his unacceptable handling of the aforementioned Title III matter.  See JE28.  Although Mansfield had numerous performance issues in the past, see supra, this was the first time the USAO formally disciplined him.

54.   Mansfield advanced a litany of excuses for his poor handling of the Title III.  We mention Mansfield's excuses for two reasons.  First, we wish to note that, in the main, Mansfield's explanations do not justify his failures.  Second, one of the major problems management had with Mansfield was that Mansfield would not accept responsibility for his failings or recognize the seriousness of his actions (or inaction, as the case may be).  See Tr. 1,

39:16-18; 1, 41:13-19; 1, 85-86; 2, 46:5-21; 9, 42-43; JE33.  The fact that Mansfield always had an excuse for his failure to perform speaks to that issue, namely, that Mansfield has trouble taking responsibility for his mistakes.

55.     Regarding the Title III, Mansfield stated that he wishes he moved it faster; he did not cancel ten (10) meetings, but rather "several" meetings; he wanted Drug division supervisor Tom Perricone to give the Title III to someone else; the SAC called to complain about this matter and three (3) others; and he (Mansfield) cancelled one meeting because he gave blood.  Tr. 2, 223-26; 4, 85-87.

56.     At about the same time, the Underwood matter came to a head.  Remember, the Underwood brief was due on December 15.  Zauzmer expected Mansfield to submit a draft of the brief a week in advance, but Mansfield did not do so.  Zauzmer asked Mansfield about the brief on December 11, and Mansfield told Zauzmer that he had not worked on it.  Mansfield knew about the Third Circuit's "no further extensions" order, but asked Zauzmer to approve another extension nonetheless.  Zauzmer refused, and Mansfield promised to submit a draft to Zauzmer on December 14, the day before the court's due date.  Again, Mansfield failed to deliver.  Left with no other viable options, Zauzmer took the Underwood file from Mansfield's office and wrote the brief himself overnight.  Tr. 8, 62-71; D102, D103; JE29.  Zauzmer chronicled this crisis in an e-mail to Magid, Hoffa, and U.S. Attorney Meehan.  See D104.

57.     As an aside, we note that throughout the trial, Plaintiff's counsel sought to minimize Mansfield's failures by labeling them as "timeliness" or "case management" issues.  We disagree with that characterization.  Rather, we agree with Zauzmer's testimony that it was "more than an issue of timeliness."  It's "an issue of not working and not performing the job."  Tr. 9, 41.  Using the Underwood situation as an example, Mansfield did not merely miss a deadline or turn-in a brief a few days late.  By his own admission, Mansfield had *not even started writing the brief the day before it was due*.  Tr. 4, 102.

58.     As with the Title III situation, *supra*, Mansfield propounded a number of excuses for his failure to work on the Underwood brief: he had just received a reprimand for the Title III incident, so he was working on that; he contracted a stomach virus two days before the brief was due; he offered to help Zauzmer with the brief, even though he (Mansfield) was sick; at least he had organized the file; and the brief had been passed-off twice before he got it.  Tr. 2, 227-29; 2, 260; 4, 92-97.

59.     On January 8, 2007, Mansfield filed another EEO complaint alleging retaliation for his June 9, 2006, complaint.  See JE7.

60.     On January 30, 2007, Magid formally proposed suspending Mansfield for two (2) days for his unacceptable handling of the Underwood brief.  See JE29.

61.     Two weeks later, on February 14, 2007, Mansfield filed yet another EEO complaint, this time in response to Magid's January 30th letter proposing Mansfield's suspension. <u>See</u> JE8.

62.     Also on February 14th, Mansfield sent an extremely disrespectful e-mail to Magid, then-First Assistant U.S. Attorney and his superior by several levels.  We quote: "Your most recent pathetic action of issuing me the letter dated January 30, 2007, is yet another example of attempting to create 'documentation' in response to past discrimination. . . . You have created this 'mess,' and now you have the unmitigated audacity to try to solve it by punishing me even further. . . .Tragically, even 'dog sh-t' is too kind a phrase for the manner in which I've been treated. . . ." D93; Tr. 4, 112-14.  To us, this illustrates Mansfield's extreme hostility to management, as well as a serious lack of judgment.

63.     The next day, on February 15, 2007, Meehan imposed the 2-day suspension previously proposed by Magid for the Underwood brief debacle.  <u>See</u> JE30.  Of course, the suspension was in the works at the end of January, well before Mansfield filed his February 14th EEO complaint.  <u>See</u> JE29.

64.     The following day, on February 16, 2007, U.S. Attorney Meehan summoned Mansfield to Meehan's office to discuss the suspension.  Mansfield initially told Meehan, the head of the USAO in Philadelphia, that he (Mansfield) was busy and wanted to meet another time.  <u>See</u> P42; P43; Tr. 6, 13-14.  Later that day, Meehan and Hoffa did meet with Mansfield regarding his 2-day suspension.  Tr. 1, 69.  In the course of the meeting, Mansfield invited settlement discussions.  Tr. 1, 70; 2, 269.  Mansfield testified that, during the meeting, Meehan told him that "time is running out" and not-so-subtly threatened Mansfield with the release of embarrassing information about Mansfield and his wife.  Tr. 2, 264-67; 4, 166.  Meehan denied making such statements and threats, Tr. 6, 17-18; 6, 82, and Hoffa confirmed that no threats were made.  Tr. 1, 125.  Given our evaluation of the relative credibility of Mansfield and Meehan, we cannot conclude that Meehan threatened Mansfield.

65.     Less than a week later, on February 22, 2007, Mansfield filed another EEO complaint. <u>See</u> JE9.

66.     Also in February of 2007, Mansfield received his annual performance evaluation for 2006.  <u>See</u> JE27.  Although Mansfield was rated "successful" in all categories, the evaluation included scathing commentary such as "Paul's timeliness was abysmal," he was only "marginally successful," and he "did not have a productive year."  <u>See</u> JE27. Mansfield refused to sign the evaluation.

67.     Throughout 2007, the problems with Mansfield's work mounted.  On March 12, 2007, Magid formally proposed suspending Mansfield for ten (10) days for his handling of two matters, namely, the Thomas matter and the Gay matter.  <u>See</u> JE31.

68.     In Thomas, the defense filed a motion to suppress on February 9, 2007.  Richard Barrett, Chief of the Firearms Unit, directed Mansfield to submit to him a draft of the response prior to filing.  Notwithstanding that instruction, Mansfield filed the response with the court without first providing it to Barrett for review.  JE31, at 1-2.  In addition, Mansfield filed the response late, mere minutes before the suppression hearing began.  JE31, at 2.  Further, Mansfield failed to adequately prepare for the upcoming trial, e.g., by failing to file any trial pleadings despite having the aid of a paralegal who prepared form jury instructions, voir dire questions, stipulations, and a verdict sheet for Mansfield to complete.  JE31, at 2-3.  Zauzmer, who looked into the situation, opined that Mansfield had done no preparation for trial at all.  Tr. 8, 77-78; D145.  Finally, Mansfield's written response failed to cite or address the controlling Third Circuit precedent upon which the judge later based his decision to suppress the evidence in question.  JE31, at 2.

69.     Mansfield made the following myriad of excuses for his failures in the Thomas matter: he was spending a lot of time on another brief for Zauzmer that was due on February 12th; he did not believe he needed to be prepared for trial because if the judge denied the motion to suppress, the defense attorney would not be ready for trial and would move for a continuance (per Mansfield's conversation with the defense attorney); the judge had moved up the hearing and understood that Mansfield's response might be late; he (Mansfield) was a few minutes late to the suppression hearing because the case agent had to check his firearm and it took longer than Mansfield expected; he (Mansfield) did not know he needed to submit jury instructions and voir dire questions several days before trial; everything would have been done before trial if it came to that; and a supervisor lost the prosecution memo.  See Tr. 2, 279-84; 4, 117-23.  Again, this is not someone who seems willing to take responsibility for his actions.

70.     A similar sequence of events transpired in the Gay matter.  See JE31, at 3-5.  On February 1, 2007, the defense filed a motion to suppress.  Mansfield did not timely file the response or seek a continuance.  Eventually, the court directed that the government respond by March 1, 2007, and set a new hearing date of March 5, 2007.  In mid-February, Hoffa tried to work with Mansfield to find an appropriate time for him to serve his 2-day suspension.  Although Mansfield generally indicated to Hoffa that this would be a bad time for him to miss work, he never mentioned that he had a response due in Gay on March 1st.  Hoffa scheduled the suspension to commence on February 28th.  On February 27th, Mansfield mentioned the Gay response for the first time, asking case supervisor Richard Barrett to delay Mansfield's impending suspension.  Barrett told Mansfield to either seek a continuance in Gay or file the response.  Mansfield stated that he would e-mail the Gay response to Barrett for review, but did not do so.  The court confirmed to Barrett that it expected the government's response the next day (March 1st), leaving no option but for others to do the work.  With the assistance of various supervisors and case agents, Zauzmer worked on the response from 3:00 PM on February 28th until 3:00 AM on March 1st.  See JE31, at 3-5; Tr. 2, 33-34; 9, 9-13.

71.     The unorganized state of Mansfield's files compounded the problem.  According to Zauzmer, Mansfield had no file on Gay, or any pending case for that matter.  Rather, Mansfield's office contained piles and piles of unorganized paper, with documents from a number of different cases all mixed together.  Tr. 9, 9-13.

72.     As with all the other disciplinary actions, *supra*, Mansfield had excuses for his failures in Gay: he had to serve a 2-day suspension and told his supervisors it was a bad time[7]; the case was not organized because he was in the midst of a Title III / electronic surveillance; and he tried to get a continuance but could not reach the judge's clerk.  Tr. 2, 285-89; 4, 129-33.

73.     On March 28, 2007, U.S. Attorney Meehan imposed the 10-day suspension previously proposed by Magid for Mansfield's handling of the Thomas and Gay matters.  See JE32. In the suspension letter, Meehan warned Mansfield that further instances of misconduct could lead to his termination.  JE32, at 2.

74.     That same day, Mansfield e-mailed Lee Janice, an EEO investigator assigned to Mansfield's case, stating Mansfield's belief that the 10-day suspension was discriminatory and retaliatory.  See JE12.

75.     Mansfield proceeded to file additional EEO complaints, or amendments thereto, on April 2, 2007; April 9, 2007; May 14, 2007; June 26, 2007; and September 13, 2007.  See JE13, JE14, JE16, JE18, JE19.

76.     Throughout this period of time, Mansfield's medical issues had largely subsided.  For example a May 16, 2007, letter between Mansfield's doctors notes that "[h]e is doing wonderful since Rythmol [a heart medication] has been discontinued.  He is mentally clearer which has made his job much better."  Tr. 4, 33-34; D209, at 25.

77.     Despite the fact that Mansfield received numerous disciplinary actions and a warning that further bad behavior could result in termination, Mansfield continued to fail in his duties as a U.S. Attorney.  On September 21, 2007, U.S. Attorney Meehan proposed Mansfield's termination for conduct unbecoming a federal employee and lack of candor toward supervisors.  See JE33.  The new charges stemmed from Mansfield's handling of two cases, namely, Fields and Rana.

78.     In Fields, Mansfield failed to file the government's response to a post-conviction motion by the court's deadline of August 8, 2007.  Mansfield never told his superiors that he missed the deadline; rather, the office learned about it when the court's secretary called to

---

[7]However, Mansfield admitted that he never told his supervisors about Gay in particular. Tr. 2, 286-88.

inquire about the yet-to-be-filed response.  When Mansfield's supervisor David Webb confronted Mansfield about the missed deadline, Mansfield claimed it had "fallen through the cracks."  JE33, at 2-3.  The court then set a new deadline of August 31st.  Mansfield missed this deadline as well, and the response he eventually filed was another deficient cut-and-paste job.  JE33, at 3-4; Tr. 7, 127-33; 9, 15-19.

79.  Again, Mansfield had excuses: he "let something fall through the cracks"; he had a major suppression hearing on the day the response was due; the matter merely involved a 2-point adjustment in a Junior Black Mafia ("JBM") sentence; he (Mansfield) did not remember it was due because of his other work; he had trouble locating the file; and he had jury duty on August 22nd and 23rd.  Tr. 2, 308-09; 2, 312; 4, 133-37.

80.  In Rana, Mansfield failed to file a response to a motion to suppress by the court's August 31, 2007, deadline, and failed to timely submit a draft response for supervisory review.  See JE33, at 4.  Even more troubling, Mansfield failed to respond openly and honestly about the missed deadlines when asked by a supervisor.  In particular, David Webb e-mailed Mansfield on Saturday, September 1, 2007, and inquired about the status of the Fields and Rana filings.  Mansfield responded that he filed Rana; Mansfield's response *did not* mention that he had filed Rana out-of-time and *did not* mention Fields at all, even though Webb had specifically asked about both Rana and Fields.  JE33, at 5; D160; Tr. 4, 143.

81.  Mansfield gave the following explanations for his failures in Rana: the defendant fired his attorney, so the case could not move forward; it was Labor Day weekend, he (Mansfield) forgot how to e-file documents and his assistant was gone for the day, so he filed the response on Saturday morning; if he had filed the response on Friday night, no one would have read it before Saturday anyway; a supervisor gave Mansfield permission to turn in the draft for review later in the day; Webb was "over-managing" him; and he "[s]aw no harm in waiting until Saturday morning."  Tr. 2, 304-305; 2, 308; 4, 141-46; 7, 139-42.

82.  Although U.S. Attorney Meehan formally proposed Mansfield's termination, management made the decision as a group, in consultation with the Office of General Counsel ("OGC").  Tr. 1, 73-74.  No single incident led to Mansfield's termination; rather, management considered the totality of the circumstances.  Tr. 1, 75.

83.  On October 25, 2007, approximately one (1) month after Meehan proposed Mansfield's termination, Hearing Officer Andrew Niedrick sustained the charges against Mansfield and approved the termination.  See JE34; Tr. 7, 69.  Even though Mansfield was fighting for his job, he continued to miss deadlines -- he was late in filing his written response to Niedrick.  JE34, at 3; Tr. 7, 71-73.  Par for the course, Mansfield had an explanation: he failed to submit his response on time "for some strategic reasons," and he had to scramble to find a working computer.  Tr. 2, 300.

84.     Niedrick is no rubber stamp.  He refused to sustain agency action on five (5), six (6), or seven (7) out of the twenty-two (22) or twenty-three (23) matters on which he worked.  Tr. 7, 65.  In addition, Niedrick oversaw ten (10) or so disciplinary actions regarding tenured AUSAs, including three (3) proposed removals.  Out of the three (3) proposed removals, Niedrick only sustained one (1) - Mansfield's.[8]  Tr. 7, 81-83.

85.     On the same day Niedrick approved Mansfield's termination, Mansfield filed another amendment to his EEO complaint.  See JE20.

86.     Management never put Mansfield on a formal performance improvement plan ("PIP") before disciplining and ultimately terminating him.  Tr. 1, 82; 2, 36.  Hoffa and Magid explained that management discussed putting Mansfield on a PIP but concluded it would not work.  Specifically, management reasoned that Mansfield would not recognize his shortcomings and would have rebuffed the intense managerial oversight and scrutiny that a PIP entails.  Tr. 1, 83; 2, 37.  We find this explanation persuasive.  Further, as a procedural matter, management need not put a tenured AUSA such as Mansfield on a PIP prior to terminating him for misconduct.  See Tr. 2, 173-74.

87.     Several of Mansfield's former co-workers testified on Mansfield's behalf.  For example, Suzanne Ercole, a friend of Mansfield's,[9] testified that she took over one of Mansfield's cases in 2003 and found his work to be very good; Mansfield performed excellently in the courtroom; and his work was comparable to that of other Strike Force attorneys.  Tr. 1, 172:12-24; 1, 174:4-11; 1, 175:5-7.  However, Ercole last saw Mansfield's work in 2003 or 2004, before the serious problems arose.  Tr. 1, 195:17-21.  Additionally, Ercole acknowledged that management had issues from time to time with the volume of Mansfield's work.  Tr. 1, 175:15-25.  Finally, Ercole did not refute any of the factual allegations upon which management based the decisions to reprimand, suspend, and terminate Mansfield.

88.     Frank Labor, another co-worker and friend of Mansfield's,[10] testified that Mansfield was a good Strike Force team member; possessed good trial skills, good judgment, and good legal and analytical skills; wrote decently; and researched well.  Tr. 1, 218.  Labor also asserted that many AUSAs, including him, missed deadlines without reprisal.  Tr. 1, 244-53.  Fellow AUSA Terri A. Marinari testified that she knew of more than a dozen instances in which one AUSA or another missed an internal deadline over her thirty-one

---

[8]In one of the other two cases, the employee resigned, so Niedrick never reached a decision on the merits.  In the other case, Niedrick suggested to the agency that it should rescind the action because he did not plan on sustaining the charges.

[9]See Tr. 1, 199:13-19; 4, 58:13-15.

[10]See Tr. 4, 58:6-12.

(31) years in the office.  Tr. 1, 267.  However, as the previously recounted facts demonstrate, Mansfield did much, much more than simply miss deadlines.  Additionally, like Ercole, neither Labor nor Marinari refuted any of the factual allegations upon which management based the decisions to reprimand, suspend, and terminate Mansfield.

89.     Throughout his time at the office, Mansfield certainly informed numerous individuals about his health-related problems.  However, Mansfield never followed through with the accommodation dialog.  In fact, Mansfield made it clear that his health was none of management's business.  See Tr. 2, 192 (Mansfield in 2003 - "I felt as if I could do the work"); Tr. 4, 10:17-20; 4, 19:9; 4, 21; 4, 39:19-23 (Mansfield testifies that he never sought an accommodation); Tr. 4, 110-11; D107; D109 (Even after Zauzmer discussed with Mansfield his ability to seek an accommodation, Mansfield stated that he did not want one); Tr. C, 51 (Per Courtney, Mansfield never wanted an accommodation); Tr. 8, 59 (Zauzmer asked what the office could do to help, but Mansfield consistently said that he did not need an accommodation); Tr. 1, 255 (Per Labor, Labor asked Mansfield what help he needs, and Mansfield responded that he could work through his medical issues); Tr. 2, 58:2-7 (Per Magid, Mansfield repeatedly said that he could do his work and did not want any accommodation); Tr. 7, 107 (Per Webb, Mansfield never asked for an accommodation); Tr. 4, 108-11; 8, 26-27; 8, 44 (Mansfield told Zauzmer that his health was none of Zauzmer's concern); Tr. 2, 191 (Mansfield did not appreciate Courtney inquiring about his fitness for duty).

90.     Mansfield testified that he believed asking for a reasonable accommodation would leave him susceptible to management's efforts to railroad him out of the office, a "trap" of sorts.  Mansfield also testified that the USAO had unfairly forced other AUSAs, including Terry Batty, Howard Perzan, and Bob Calo, out of the office in the past.  Tr. 4, 22-24.  Zauzmer testified at length to the circumstances surrounding the departures of Batty, Perzan, and Calo, and strongly disputed Mansfield's contention that management forced any of them to leave.  Tr. 8, 6-10.

91.     Importantly, although management gave Mansfield ample time and opportunity to improve, he showed no signs of doing so and refused to accept responsibility for his failures.  See Tr. 1, 39:16-18 (Per Hoffa, the "[s]ituation had gone on for a long time, and there was absolutely no improvement. . . ."); 1, 41:13-19 (Per Hoffa, Mansfield had not been performing well, and things were not improving); 1, 85-86 (Per Hoffa, Mansfield rebuffed all the supervisors' efforts to engage him and help him improve his performance); JE33 (Per Meehan in recommending termination, Mansfield's "repeated pattern of similar misconduct does not suggest that there is any potential for rehabilitation"); 6, 76 (Per Meehan, Mansfield never acknowledged the seriousness of his actions, but rather took an aggressive approach against those who raised the issues with him); JE34 (Per Niedrick's removal letter to Mansfield, "[y]our actions in failing to meet the filing deadlines in this matter, coupled with your actions as charged, clearly suggest that your potential for rehabilitation is lacking"; "[m]oreover, your apparent refusal to

acknowledge the seriousness of your misconduct. . .cannot be underestimated"; and "[y]our actions here demonstrate that you are unwilling to correct your behavior and that you are unresponsive to progressive discipline."); Tr. 7, 73-74 (Per Niedrick, Mansfield failed to acknowledge the seriousness of his actions); Tr. 2, 40:7-16 (Per Magid, Mansfield's performance deteriorated throughout 2007, and Mansfield complained constantly about being over-managed).  Tr. 7, 115-17 (Per Webb, by mid-2007, Mansfield continued to fail to move his cases and had become even angrier.).

92.     We now turn briefly to the issue of comparators.  Mansfield claims that management treated him more harshly than it treated other similarly-situated individuals (the "comparators").  If true, this may form the basis for us to infer retaliation.  However, we find none of the comparisons persuasive because the supposed comparator AUSAs were *not* similarly-situated to Mansfield.  In particular, the evidence before us shows that no AUSA except Mansfield repeatedly and consistently failed to perform his duties over an extended period of time; was not open-and-honest with his superiors about his failures; did not appreciate or recognize the seriousness of the problem; and showed no signs of improvement, making rehabilitation extremely unlikely.  Additionally, no AUSA on record faced the kind of progressive discipline imposed on Mansfield here.  In short, Mansfield was unique.

93.     For example, AUSA 1, the first comparator, inappropriately lost his temper and acted unprofessionally at times.  He received an official reprimand and a 2-day suspension for his actions.  See P15, P18, P19.  This conduct does not approach the level of Mansfield's, and Meehan recognized that AUSA 1 had great potential for rehabilitation.  P19; Tr. 6, 42.

94.     AUSA 2 failed to file or submit documents in a timely manner in five (5) separate cases during 2002 and received an official reprimand in April of 2003.  See P21.  She also received an official reprimand in November of 2003 for failing to maintain an active bar membership.  See P22.  Although this conduct is closer in kind and severity to Mansfield's, we see significant differences.  First, AUSA 2 had no prior record of formal disciplinary action.  See P21, at 2.  And as detailed *supra*, Mansfield's problems reached far beyond simply missing deadlines.  Finally, AUSA 2 retired shortly after the disciplinary actions, so we do not know what the office would have done had AUSA 2 stayed and continued to underperform.  Tr. 1, 156-57; 6, 43.

95.     AUSA 3 received an official reprimand in 2004 for violating the Speedy Trial Act in two (2) cases.  Unlike Mansfield, this was AUSA 3's first disciplinary action; he made progress in his performance; and he acknowledged the seriousness of his actions.  See P23.

96.     In 2005, AUSA 4 received a three (3) month suspension for failing to comply with the Speedy Trial Act in four (4) criminal cases and providing supervisors with misleading

information about the status of those cases.  <u>See</u> P24.  However, management discovered these multiple failures all at once, which gave no opportunity for progressive discipline. Tr. 6, 49-50.  Additionally, unlike Mansfield, AUSA 4 readily accepted increased supervision and close scrutiny of his work; had no prior disciplinary history; and showed a positive attitude.  <u>See</u> P24.

97.  Finally, in 2007, AUSA 5 received a 2-day suspension for failing to investigate and complete an S-Visa application for a cooperating defendant and lying to her supervisor about the situation.  <u>See</u> P25, P26.  Although troubling, this conduct does not rise to the level of Mansfield's.  And again, AUSA 5 had no prior disciplinary record.  <u>See</u> P25, P26.

98.  The various decision makers in this matter consistently testified that they did not take any action against Mansfield because of his health problems or EEO complaints.  <u>See</u> Tr. 1, 115-16; 1, 122-23; 2, 58-59; 6, 79-80; 7, 75-76.

99.  In the end, we cannot know for sure why everyone did what they did over the course of this multi-year saga.  However, the weight of the evidence supports Webb's succinct appraisal of the situation: Physically, Mansfield could do the work, but Mansfield's all-encompassing anger at management "clouded his ability to really do the job." Tr. 7, 156-57.

100.  Mansfield certainly put the USAO in a difficult position, but not because he had health problems or filed EEO complaints.  Mansfield was not doing his job, did not communicate forthrightly with his supervisors, did not improve, and would not ask for or accept help.  Sadly, this confluence of failures led to his termination.  In this regard, we concur with Zauzmer's testimony that no other viable alternative remained: "if the person refuses to tell you what his problem is and help you with it and ask for an accommodation, and if the person – and if you don't do discipline in order to move towards a process where he may lose his employment, what's left?  The only thing that's left is to say, Mr. Mansfield, go to your office, sit there and do whatever you want to do and we'll leave you alone and we can't do that."  Tr. 9, 42-43.

III.  <u>Conclusions of Law</u>

1.  As we noted *supra*, the only claim before us is Mansfield's Rehabilitation Act retaliation claim.  <u>See</u> Doc. No. 22 (ordering dismissal of all other counts pursuant to the parties' stipulation).  Speaking generally, the Rehabilitation Act prohibits federal government agencies from discriminating based on disability.  <u>Kondas v. Potter</u>, 328 Fed. App'x 116, 119-20 (3d Cir. 2009). To do so, the Act provides that "[n]o otherwise qualified individual with a disability. . .shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program

or activity conducted by any Executive agency or by the United States Postal Service."
29 U.S.C. § 794(a).  In evaluating Rehabilitation Act claims, we apply the same
substantive standards as we do to claims brought under the Americans with Disabilities
Act of 1990 ("ADA").  29 U.S.C. § 794(d).

2.    However, no Rehabilitation Act *discrimination* claim remains in this matter; only a
      *retaliation* claim is left.  In that regard, "[a]n employer may not take adverse employment
      actions against an employee because he or she engages in activity protected under the
      [Rehabilitation] Act, such as the filing of discrimination complaints with the EEOC."
      Kondas, 328 Fed. App'x at 120 (citations omitted).  The evidentiary framework we utilize
      to evaluate a retaliation claim depends on whether we characterize the matter as a
      "pretext" suit or a "mixed-motives" suit.  Shellenberger v. Summit Bancorp, Inc., 318
      F.3d 183, 187 (3d Cir. 2003).

3.    Here, Mansfield espoused a pretext-type theory, asserting that management rewrote a
      one-sided history to justify the disciplinary actions against Mansfield, when in fact
      management acted in retaliation for his protected activity.  Therefore, we analyze
      Mansfield's retaliation claim using the pretext framework.  Also, as detailed *supra* in our
      Findings of Fact, Mansfield did not present any credible direct evidence of retaliation.  As
      such, the pretext framework is most appropriate.  See Venter v. Potter, 435 Fed. App'x
      92, 96 (3d Cir. 2011) ("Where, as here, the plaintiff is without direct evidence of either
      discrimination or retaliation, we analyze such claims using the familiar burden-shifting
      framework set forth in McDonnell Douglas Corporation v. Green. . .").

4.    The burden-shifting analysis in a pretext-type retaliation case proceeds as follows:

            [i]n order to prevail under a 'pretext' theory of illegal retaliation a
            plaintiff must show: (1) protected employee activity; (2) adverse
            action by the employer either after or contemporaneous with the
            employee's protected activity; and (3) a causal connection between
            the employee's protected activity and the employer's adverse
            action. . . .If the plaintiff is able to establish these elements of
            his/her *prima facie* case, the burden shifts to the employer to
            advance a legitimate, non-retaliatory reason for its adverse
            employment action.  If the employer satisfies that burden, the
            plaintiff must then prove that retaliatory animus played a role in the
            employer's decisionmaking process and that it had a determinative
            effect on the outcome of that process.

      Shellenberger, 318 F.3d at 187 (internal citations and quotations omitted).  See also
      Kondas, 328 Fed. App'x at 120 (applying this same framework in a Rehabilitation Act
      retaliation context).

                                          22

5.      Of course, "[w]hile the burden of proof may shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Shellenberger, 318 F.3d at 187 n.5 (citation omitted).

6.      As the quoted framework makes clear, the Act does not insulate all employee activity, only "protected" activity.  Protected activity includes "opposition to any act or practice made unlawful" by the Act; or making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing pursuant to the Act.  See Evans v. Maax-KSD Corp., 309 Fed. App'x 644, 645-46 (3d Cir. 2009) (citation omitted); Montanye v. Wissahickon Sch. Dist., 218 Fed. App'x 126, 130-31 (3d Cir. 2007) (citation omitted).  More specifically, protected activity undoubtedly encompasses an employee's filing of EEO complaints, Shellenberger, 318 F.3d at 188, and an employee's good faith request for a reasonable accommodation.  Id. at 191 (recognizing that "[t]he right to request an accommodation in good faith is no less a guarantee. . .than the right to file a complaint with the EEOC."); Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010) (confirming that "[p]rohibited discrimination. . .includes retaliation against an employee for requesting an accommodation.") (citation omitted).

7.      Regarding the causation prong of the burden-shifting analysis, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citation omitted).  Accordingly, "[t]he amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation."  Shellenberger, 318 F.3d at 189.  A retaliation plaintiff may also "show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation."  DeFlaminis, 480 F.3d at 267 (citation omitted).

8.      In DeFlaminis, the Third Circuit recently emphasized that the courts should take the causation requirement seriously.  We quote:

           A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual

capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

DeFlaminis, 480 F.3d at 267-68.

9.    As mentioned *supra*, if a plaintiff proves a *prima facie* case of retaliation, the burden then shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action.  "The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." Shellenberger, 318 F.3d at 189 (citation omitted).

10.   "Once the employer meets its relatively light burden, the burden of production returns to the plaintiff, who must show by a preponderance of the evidence that the employer's proffered reason is pretextual. . . .Because the ultimate issue is whether 'discriminatory animus' or retaliation motivated the employer in terminating the plaintiff, it is not enough to show that the employer made a wrong or mistaken decision. . . .Rather, the plaintiff must uncover weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's explanation" such that the factfinder believes the employer did not truly act for the asserted reason.  Venter, 435 Fed. App'x at 96 (citing Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994)).

11.   Finally, we note that a plaintiff's failure to establish that he is disabled under the law does not preclude recovery on a retaliation claim.  Shellenberger, 318 F.3d at 188.  Of course, as with all retaliation claims, a non-disabled plaintiff must still prove that his employer took adverse action against him because he engaged in protected activity.  Id.

12.   Coming now to the matter at hand, we have no trouble finding that Mansfield engaged in protected activity.  During the eighteen (18) month period from April of 2006 through October of 2007, Mansfield filed at least ten (10) pre-complaints, complaints, or amendments to complaints with the EEO.  See Findings of Fact, *supra*.  These filings constitute protected activity.  See Shellenberger, 318 F.3d at 188.

13.   A good faith request for a reasonable accommodation also qualifies as protected activity. See id. at 191; Sulima, 602 F.3d at 188.  However, we conclude that Mansfield never made such a good faith request.  Instead, Mansfield steadfastly and repeatedly denied that he wanted or needed an accommodation and essentially told his supervisors that his health was none of their business.  See Findings of Fact, *supra*.

14.   We realize that the "law does not require any formal mechanism or 'magic words' to notify an employer that an employee needs an accommodation."  Colwell v. Rite Aid Corp., 602 F.3d 495, 506-07 (3d Cir. 2010) (citation omitted).  However, the employee "must make clear that. . . [he/she] wants assistance for his or her disability." Id. at 506 (citation omitted).  "A party that fails to communicate, by way of initiation or response, may. . .be acting in bad faith.  In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility." Id. at 507 (citation omitted); see also Castellani v. Bucks Cnty. Municipality, 351 Fed. App'x 774, 777 (3d Cir. 2009) (stating that "[i]n order to show that an employer has breached its duty to engage in the interactive accommodation process, the employee must demonstrate that the employer knew of the disability, that the employee requested accommodations, that the employer did not make a good faith effort to assist, and that the employee could have been reasonably accommodated but for employer's lack of good faith.") (internal citations and quotations omitted).

15.   Here, Mansfield *did not* make clear that he wanted assistance for his alleged disability. Just the opposite.  When supervisors asked Mansfield about his health and whether he wanted an accommodation, Mansfield rebuffed their efforts.  See Findings of Fact, *supra*. Therefore, Mansfield bears responsibility for the breakdown in dialog with management. Even though Mansfield occasionally asked his supervisors for work-related allowances, e.g., to work late, or have Labor supervise him, or to take certain cases or assignments away from him, Mansfield *did not* make a good faith effort to follow-through with the accommodation request.  Therefore, merely asking for these allowances does not constitute a good faith accommodation request and, correspondingly, does not qualify as protected activity.

16.   Similarly, Mansfield's (1) general discussions with management about his medical issues and (2) decision not to settle his EEO claims do not embody protected activity either. Protected activity includes "opposition to any act or practice made unlawful" by the Act; or making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing pursuant to the Act.  See Evans, 309 Fed. App'x at 645-46; Montanye, 218 Fed. App'x at 130-31.  An employee speaking generally about his health problems in the workplace does not fall within any of the protected activity categories.  Neither does declining to settle an EEO claim.  However, we stress that our ultimate conclusion in this matter would not change, even if all the aforementioned actions fell within the ambit of protected activity.  We see no retaliation in any event. Further, Mansfield's Complaint asserts *only his EEO claims* as protected activity.  (See

25

Doc. No. 1-1 ¶¶ 252-59).  His belated attempt to broaden the scope of his protected activities did not give Defendant fair notice and is improper.  See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 499 n.1 (3d Cir. 1997).

17.     Regardless, Mansfield obviously engaged in some protected activity, namely filing numerous EEO complaints.  As such, we move to the second step of the burden-shifting analysis: adverse action by the employer either after or contemporaneous with the employee's protected activity.  Here, Defendant surely took adverse employment actions against Mansfield, including the written reprimand, 2-day suspension, 10-day suspension, and termination.  See Findings of Fact, *supra*.

18.     We now turn to the last step of the *prima facie* inquiry, i.e., whether Mansfield proved that his protected activity caused Defendant to discipline him and ultimately terminate his employment.  We hold that Mansfield did not meet this burden.  We believe the relatively close temporal proximity between Mansfield's EEO complaints and management's disciplinary actions would allow us, *but does not compel us*, to find the requisite causal link in this case.  First, since Mansfield filed at least ten (10) EEO complaints over an eighteen (18) month period, we hardly find it surprising that the adverse employment actions occurred shortly after one complaint or another.  Additionally, we see no credible direct evidence of retaliation by management against Mansfield.  Rather, all management's disciplinary actions were reasonable and well-supported by the evidence. See Findings of Fact, *supra*.  Finally, the various decision makers in this matter consistently testified that they did not take any action against Mansfield because of his health problems or EEO complaints, and we find that testimony to be credible and truthful.

19.     We see this as a "chicken or the egg" problem: which came first?  Mansfield would have us infer that management disciplined him because of his EEO complaints (EEO complaint –> discipline –> EEO complaint –> discipline, and so on).  However, the weight of the evidence supports the opposite conclusion: Mansfield filed EEO complaints because management disciplined him or he thought management treated him unfairly (transfer from Strike Force –> EEO complaint –> discipline –> EEO complaint, and so on).

20.     For example, management told Mansfield about his transfer out of Strike Force on April 24, 2006, and Mansfield filed his first EEO complaint three (3) days later.  See JE1.  On January 30, 2007, Magid proposed suspending Mansfield for two (2) days, and two (2) weeks later, Mansfield filed an EEO complaint explicitly referencing Magid's proposed suspension.  See JE8.  On March 28, 2007, U.S. Attorney Meehan upheld Mansfield's 10-day suspension, and Mansfield filed several EEO complaints in the weeks that followed. See JE13, JE14, JE16.

21.     We heed the Third Circuit's admonition to diligently enforce the causation requirement.

26

DeFlaminis, 480 F.3d at 267-68.  As the DeFlaminis court correctly pointed out, putative plaintiffs sometimes engage in protected activity hoping to insulate themselves from entirely appropriate adverse employment actions.  Id.  In layman's terms, a poorly-performing employee might file EEO complaints or the like to dissuade his employer from firing him.  The employer might acquiesce and keep the employee on board, not because he deserves it, but because the employer does not want to face a retaliation suit.  By requiring a retaliation plaintiff to actually prove causation, courts can discourage this undesirable strategic behavior.

22.     Even if Mansfield did prove causation, and we conclude he did not, the USAO[11] advanced legitimate, non-retaliatory reasons for each and every one of the employment-related actions taken with respect to Mansfield, including his transfer out of Strike Force, the written reprimand, the 2-day suspension, the 10-day suspension, the proposal of termination, and the actual termination.  We laid out these legitimate reasons in great detail in our Findings of Fact, *supra*, and we see no need to repeat them here.

23.     Mansfield failed to prove by a preponderance of the evidence that the USAO's proffered reasons are pretextual.  As mentioned above, we see no credible direct evidence of retaliation by management against Mansfield.  Instead, the overwhelming weight of the evidence, direct and circumstantial, indicates that Mansfield was disciplined and eventually terminated because of his work-related conduct and performance failures, not because of his protected activity.  In fact, for the most part, Mansfield does not dispute the specific factual allegations levied against him by the USAO.  Rather, he argues that his conduct and performance did not merit the discipline he received.  We disagree.  In the end, Mansfield simply did not persuasively discredit any of management's proffered reasons for disciplining him, much less tie the adverse employment actions to his protected activity.

24.     We recognize that an employee who "received glowing performance evaluations" until he filed an EEO complaint and then suddenly became a poor performer in the eyes of management might state a strong case for pretext.  See DeAngelo v. DentalEZ, Inc., 738 F. Supp. 2d 572, 583-84 (E.D. Pa. 2010).  However, Mansfield's pre-EEO complaint evaluations, while decent, were certainly not glowing.  See Findings of Fact ¶ 21, *supra*.  Therefore, Mansfield's performance evaluations say little about the issue of pretext.

25.     In addition, an employer's disparate treatment of two similarly-situated employees, one who engaged in protected activity and one who did not, may be evidence of pretext.  However, comparisons between two individuals who are *not* similarly situated have little evidentiary value.  DeFlaminis, 480 F.3d at 269.

---

[11]We include Andrew Niedrick, the Hearing Officer who ultimately sustained Mansfield's termination, under the general "USAO" label.

26.    Here, Mansfield claims that management treated him more harshly than it treated other similarly-situated individuals (the "comparators"). If true, this may form the basis for us to infer retaliation. However, we find none of the comparisons persuasive because the supposed comparator AUSAs were *not* similarly-situated to Mansfield. In particular, the evidence before us shows that no AUSA except Mansfield repeatedly and consistently failed to perform his duties over an extended period of time; was not open-and-honest with his superiors about his failures; did not appreciate or recognize the seriousness of the problem; and showed no signs of improvement, making rehabilitation extremely unlikely. Additionally, no AUSA on record faced the kind of progressive discipline imposed on Mansfield here. In short, Mansfield was unique. Findings of Fact ¶¶ 92-97, *supra*.

27.    We also note that an employer's failure to follow a disciplinary policy might demonstrate pretext. See Craig v. Y & Y Snacks, Inc., 721 F.2d 77, 80 (3d Cir.1983). That did not happen here; Mansfield was fired in accordance with applicable regulations. Findings of Fact ¶ 86, *supra*.

28.    At bottom, a plaintiff in a retaliation case has the ultimate burden of persuading the trier of fact that the defendant employer took adverse action because of the plaintiff's protected activity. Here, Mansfield failed to meet this burden. The substantial weight of the evidence demonstrates that Mansfield repeatedly failed to perform his duties over an extended period of time; was not open-and-honest with his superiors about his failures; did not appreciate or recognize the seriousness of the problem; and showed no signs of improvement, making rehabilitation extremely unlikely. Management disciplined Mansfield for these failures, not in retaliation for his protected activity.

IV.    <u>Conclusion</u>

For the aforementioned reasons, we find for the Defendant on Count II, Plaintiff's

Rehabilitation Act retaliation claim. We shall enter final judgment accordingly.


BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.